JUAN ORTIZ y CRUZ MARÍA TAPIA, por si y como padres con patria potestad sobre su hijo menor JOSÉ LUIS ORTIZ TAPIA, demandantes y apelados, *v.* AUTORIDAD DE TRANSPORTE DE PUERTO RICO y GREAT AMERICAN INDEMNITY COMPANY, demandadas y apelantes.

Número 11977.

*Sometido:* 12 de noviembre de 1957. *Resuelto:* 28 de marzo de 1958.

234

R. *Rivera Zayas*, G. *Rivera Cestero*, *Milton F. Rúa* y *A. Segurola de Diego*, abogados de las apelantes; *José A. Suro* y *Antonio J. Amadeo*, abogados de los apelados.

EL JUEZ ASOCIADO SEÑOR PÉREZ PIMENTEL emitió la opinión del Tribunal.

Alrededor de las 12:40 P. M. del día 30 de marzo de 1955 el joven de diez y seis años y medio de edad, José Luis Ortiz Tapia, fué arrollado por un ómnibus propiedad de la Autoridad de Transporte. El accidente ocurrió al intentar el joven Ortiz cruzar la Avenida Ponce de León, Parada 8, en dirección de norte a sur mientras el tránsito de vehículos de motor discurría en una sola dirección de oeste a este. Al

momento del accidente el ómnibus ocupaba el tercer carril contado de norte a sur mientras los dos primeros carriles se encontraban ocupados por vehículos que se movían hacia Santurce.

José Luis y sus padres interpusieron demanda contra la Autoridad de Transporte y su aseguradora Great American Indemnity Company en reclamación de los daños y perjuicios sufridos por ellos con motivo de dicho accidente. Después de un juicio en los méritos el Tribunal Superior dictó sentencia declarando con lugar la demanda y concediendo a José Luis una indemnización de $8,000 y a sus padres una de $800, más las costas. Contra dicha sentencia interpusieron las demandadas el presente recurso de apelación.

En cuanto a la forma como ocurrió el accidente, el tribunal a quo formuló las siguientes conclusiones de hecho:

"Como a las doce y media de la tarde del 30 de marzo de 1955, José Luis se dispuso a cruzar de norte a sur la Avenida Ponce de León, Parada 8, saliendo del Parque Muñoz Rivera. Esa carretera en ese sitio tiene cuatro carriles y los vehículos sólo pueden transitar de oeste a este. A pesar de que venían tres líneas paralelas de vehículos de motor en marcha, José Luis empezó a cruzar la avenida andando ligero, pues sentía hambre y tenía prisa en coger el autobús el cual venía despacio ya que a pocos pies de distancia iba a detenerse en la parada de guaguas. Los dos automóviles de los carriles primero y segundo, contando de norte a sur, pararon a tiempo para no arrollar al demandante, pero la mencionada guagua que venía un poco atrás en el tercer carril, chocó con su parte delantera izquierda con José Luis.

"Delgado no vió a José Luis antes del accidente, lo que nos lleva a la inferencia de que en ese momento Delgado estaba distraído y miraba hacia el lado derecho de la avenida.

". . . . . . . .

"La última oportunidad de evitar el accidente la tuvo el chófer Delgado, pues si él hubiera guiado la guagua con razonable diligencia fácilmente hubiera visto a tiempo a José Luis cruzando la carretera, tal como lo habían visto los conductores de los automóviles que iban en los carriles primero y segundo. Delgado estaba en mejor posición para ver a José Luis que los

otros dos conductores ya que el asiento de la guagua queda mucho más alto que el de los automóviles y por lo tanto la visibilidad es mayor. Si bien es verdad que José Luis fué negligente al cruzar la avenida a pesar del tránsito que circulaba, la última oportunidad de evitar el accidente la tuvo el chófer de la guagua y por lo tanto la causa próxima del accidente fué la negligencia de este chófer por no estar en actitud alerta mientras conducía un vehículo público por una avenida importante de la capital de Puerto Rico. Si hubiera estado mirando hacia el frente y oblicuamente (*Figueroa* v. *Picó,* supra, pág. 404) hubiera visto a José Luis a distancia suficiente para detener la guagua a tiempo."

Como única conclusión de derecho formuló la siguiente:

"A nuestro entender es de aplicación a los hechos de este caso la doctrina de la última oportunidad para evitar el accidente."

Por los primeros dos señalamientos de errores, los apelantes atacan la indicada conclusión de derecho y sostienen que fué error de dicho tribunal no concluir, en contrario, "que el accidente fué causado por la única y exclusiva negligencia del menor José Luis Ortiz Tapia o que por lo menos fué causado por la negligencia contributoria de dicho menor". Creemos que este punto es decisivo para las partes y pasaremos a considerarlo inmediatamente. Para ello es conveniente hacer primero un resumen de la prueba presentada por las partes sobre la ocurrencia del accidente.

Sobre ese extremo los demandantes presentaron el testimonio del lesionado José Luis Ortiz Tapia y del chófer del ómnibus, Juan Delgado Dones.

José Luis Ortiz declaró que tenía 18 años de edad, vivía en Cantera, Caserío Bartolomé de las Casas, y en la mañana del 30 de marzo de 1955 fué a la Playa del Parque a cobrar un dinero que le debían. Allí estuvo como hasta las doce del día. A esa hora iba a regresar a su casa pero al cruzar la avenida andando para coger la guagua venía un *carro* negro y se paró "y yo seguí cruzando y me cogió la guagua entonces—llegando a la guagua"; que al pasar frente al

carro negro la guagua venía *cerquita* más atrás que el carro
negro; que en el momento en que él se tiró a cruzar la ave-
nida había tres líneas de carros en movimiento en dirección
de San Juan hacia el puente; que el primer carro y el
segundo pararon cuando él se tiró a cruzar; que ni delante
ni detrás de estos carros venían otros carros y que no había
casi tráfico allí en ese momento; que él tenía interés en
llegar temprano a su casa porque tenía hambre, llevaba
prisa y por eso no esperó a que pasaran los dos automóviles;
que iba cruzando a prisa, andando bien ligero; que pasó por
delante de los automóviles que iban por los primeros dos
carriles en un momento en que la guagua venía un poquito
más atrás que esos automóviles.

Juan Delgado Dones declaró que es mecánico y chófer y
que el día 30 de marzo de 1955 conducía como chófer una
guagua propiedad de la Autoridad de Transporte; que el
asiento del chófer de esa guagua queda en la parte izquierda
delantera un poco más elevado que los demás asientos del
vehículo; que él puede mirar desde su asiento por encima
de la capota de los demás automóviles; que ese día cubría
la ruta de San Juan a Villa Palmeras; que tuvo un acci-
dente en la Parada 8-½, frente al Parque Muñoz Rivera;
que en la guagua iban más de diez pasajeros sentados y
veinte de pie; que salió de San Juan alrededor de las
12:30 P. M.; que frente al Parque iba por el tercer carril
de izquierda a derecha; que el cuarto carril estaba ocupado
por vehículos estacionados; que conoce bien la ruta y ese
sitio y sabe que hay bastante gente que cruza del Parque
hacia la acera opuesta y sabe que hay que ir mirando, poco
a poco y estar pendiente; que se había detenido en la parada
anterior y luego cuando prosiguió, alguien tocó el timbre
para quedarse en la próxima parada; que "entonces dejé ir
la guagua sin darle gasolina para terminar de parar, cuando
de repente ví un celaje delante de la guagua", como a un
pie de la guagua; que vió al muchacho en el mismo momento
que le dió la guagua pero que no lo vió a gran distancia

para poderlo salvar; que no vió al muchacho cuando éste cruzó el primero y el segundo carril; que iba bien despacio y si lo hubiera visto como a cinco pies, usa el freno, para y no ocurre el accidente pero que lo vió cuando estaba junto a la guagua; que el impacto fué con la parte izquierda delantera de la guagua; que en ese momento iban pasando muchos carros, había bastante tráfico; que él iba mirando hacia el frente; que al sentir el impacto detuvo la guagua y el muchacho cayó frente a la guagua; que si la guagua no hubiera tenido buenos frenos, le pasa por encima al muchacho; que aunque se iba a detener en la parada que queda a la derecha no iba mirando para la *lápida* de la parada sino que iba mirando hacia el frente; que en el momento del accidente la guagua corría como a cinco o seis millas o kilómetros ya que la guagua estaba parando; que el accidente ocurrió como a diez o quince pies de la parada; al momento del accidente tenía el pie puesto en el freno y sólo tuvo que apretarlo; la guagua paró en seguida como a cuatro pies. En la repregunta declaró que le dieron lentes para leer pero no para trabajar porque ve bastante bien; que lo que recuerda exacto "es el bulto, el golpe—y frené en seguida", que no vió al muchacho antes del accidente.

Los demandados presentaron los siguientes testigos:

*Domingo Olivieri,* quien declaró que el día 30 de marzo de 1955 conducía un automóvil de San Juan hacia Santurce por la Parada 8. Una guagua iba despacio por el carril derecho un poco más adelante que el testigo pero éste le dió alcance. Delante de su carro pasó un muchacho corriendo que venía como del Parque Muñoz Rivera; el auto que iba delante del testigo frenó y el testigo hizo lo mismo y entonces sintió el golpetazo que le dió la guagua; que todo eso pasó con rapidez; que a esa hora había en aquel sitio mucho tráfico.

*Carmelo Hernández Tirado:* declaró que era un pasajero de la guagua; que en ese momento había mucho tráfico y la guagua iba lentamente casi parándose; que vió al mu-

chacho salir corriendo por delante de otros automóviles, uno de los cuales frenó; que el muchacho fué a dar contra la parte izquierda delantera de la guagua.

*Felipe Pacheco Calderón:* Iba como pasajero de la guagua en uno de los últimos asientos del lado izquierdo. Vió al muchacho que venía corriendo del Parque a cruzar la carretera por delante de unos carros que venían; que el muchacho siguió corriendo y le dió a la guagua por su parte delantera izquierda; la guagua paró inmediatamente; la guagua iba despacio como a 10 ó 15 millas por hora; que el testigo tiene un defecto en su ojo derecho pero que con el izquierdo ve bien y que vió al muchacho venir "zafado".

*Adolfo Colón Dones:* declaró que era un pasajero sentado en el tercer asiento de la parte izquierda de la guagua; vió al muchacho que venía corriendo a cruzar la calle por delante de unos automóviles en movimiento; estos automóviles pegaron freno y el muchacho pasó y entonces fué que le dió a la guagua por su parte izquierda, al lado del chófer; que la guagua iba de cinco a diez millas por hora y que faltaban como 30 pies para llegar a la parada; que todo sucedió rápidamente.

■■ Respecto a la doctrina de "la última oportunidad" hemos dicho: "Esta 'doctrina da por sentada la existencia de una situación peligrosa creada por la negligencia tanto del demandante como del demandado, pero supone que hubo un momento después de ocurrir tal negligencia en que el demandado podía, y el demandante no podía, mediante el uso de los medios disponibles, evitar el accidente. No es aplicable si la emergencia es tan súbita que no hay tiempo para evitar la colisión, ya que el demandado no viene obligado a actuar instantáneamente'. *Dean* v. *Century Motors,* 154 F.2d 201, 202 (C.C.A., D.C., 1946); *Capital Transit Company* v. *Grimes,* 164 F.2d 718 (C.C.A., D.C., 1947); *Miranda* v. *Porto Rico Ry., Lt. & P. Co.,* 42 D.P.R. 719; *Ayala* v. *Matías,* 54 D.P.R. 348; *E. Solé & Co.* v. *American*

*Railroad Co.,* 61 D.P.R. 752, 762–3; Anotación, 92 A.L.R. 47." *Sucn. Ortiz* v. *Ramírez,* 68 D.P.R. 498, 505.

Para poder aplicar la anterior doctrina a los hechos de este caso, el tribunal sentenciador venía obligado a concluir que la situación peligrosa en que se colocó el demandante Ortiz fué creada por su propia negligencia [y sobre esto último no cabe duda alguna] y además por la negligencia del chófer del ómnibus. Para arribar a esta última conclusión, dicho tribunal hace "la inferencia de que en ese momento [el momento del accidente] Delgado [chófer del ómnibus] estaba distraído y miraba hacia el lado derecho de la avenida." La prueba no da base a la inferencia de la supuesta distracción y descuido del chófer del ómnibus. Lo que revela la prueba es que el ómnibus corría lentamente porque estaba llegando a la parada donde iba a detenerse. El chófer iba mirando hacia el frente y aunque como regla general y bajo determinadas circunstancias el chófer tiene el deber de vigilar no sólo hacia el frente sino que también oblicuamente, en este caso específico, tenía más bien el deber de mirar especialmente hacia el lado lateral derecho donde iba a detener el vehículo. Esto no lo exime de ver aquello que esté dentro de su visibilidad periférica o lateral, pero dada las circunstancias concurrentes, no podemos convenir en que el no ver al joven Ortiz cuando éste se lanzó a cruzar la avenida, frente a otros vehículos en movimiento en un momento de tráfico denso, constituya falta de vigilancia o negligencia. Cf. *Figueroa* v. *Picó,* 69 D.P.R. 401. La prisa que llevaba para abordar el ómnibus que se acercaba a la parada llevó al joven Ortiz a lanzarse imprudentemente a cruzar una avenida ocupada por tres líneas de vehículos de motor en movimiento. El chófer del ómnibus no podía prever que frente a las otras dos líneas de automóviles que quedaban a su izquierda, una persona fuera a lanzarse al peligro que representaba cruzar la Avenida Ponce de León a esa hora y por ese sitio. Su aparición frente al lado izquierdo del ómnibus fué algo súbito e inesperado y

el chófer sólo pudo hacer lo que prudentemente hubiera hecho cualquier otra persona en su lugar, esto es, aplicar inmediatamente los frenos para detener el vehículo. Él no tuvo tiempo para evitar el accidente, y por lo tanto, no se le puede imponer responsabilidad a base de la teoría de "la última oportunidad", máxime cuando no había incurrido en negligencia. *Matos* v. *Pabón*, 63 D.P.R. 890.

*La sentencia apelada será revocada y en su lugar se dictará otra declarando sin lugar la demanda.*